Last case this morning is in re Marriage of Myers, 5-0-9-0-3-9-5. Counsel, you may proceed. Trustees, members, my name is Jim Drazen and I represent the appellant in this case, Mr. Artie Myers. This case involves a dissolution of marriage and I believe some of the facts that were elicited at the trial court are necessary to set the stage for my argument, if I may. Artie Myers lived on a farm. He was born and raised on his family farm. That farm consisted of approximately 120 acres. It was in the Myers family for several generations. My client worked on that farm from the time he was a very young man up until the time of the dissolution of marriage. As a child, as a young teenager, he worked on the farm and began breeding cows, even breeding cows on the farm. Before he got married to Paul, which he did in July of 1980, he acquired 20 acres of that same Myers farm from his father for the purpose of building a house on the farm. So at the time the parties got married, on the Myers farm, and there's three separate farms that include the Myers property, if you will, on the Myers farm there were two separate houses, sheds, buildings, dairy farmers, numerous other buildings that were necessary for the farming operation to take place. Mr. Myers' father continued to farm for some period of time but farmed less and less as time went on. As time went on, Mr. Myers' father and mother then deeded the property to Artie and his then wife, reserving for themselves a life estate in that property so that they could continue to reside there. Thereafter, Artie and Paul Myers acquired two more parcels of property called the Gall Farm and the Jacobs Farm, which also consisted of almost 120 acres at the same time. It's important to note that the time they married in 1980, Paul was 19 years old, by the court's own judgment brought nothing into this marriage. The parties continued to live in that house that Artie had built until 2007. During that time period, the parties incorporated Reddiview Farms in January of 1991. Now prior to January of 1991, Mr. Myers' father ran a business known as Reddiview Farms, unincorporated, since early in the 60s. But they incorporated that, and they incorporated it according to the Old Testament, it was for tax purposes. Their tax attorney said, it's important for you to incorporate it, it's beneficial for you to incorporate this farm, and they did that at that point in time. In addition to farming- Who was the corporation? Who was the corporation officers? The corporation officers were both the parties. They were both the petitioner and the respondent. At the time of the filing for disillusioned marriage, Artie and Paul also worked outside jobs. Artie drove a semi-truck, and Paul drove a bus, and Artie filed a petition for disillusioned marriage in July of 2007, shortly after the separation of the parties. The parties continued to argue during the time period that this issue was going on, that disillusion was going on, and it required several trips back to court to get orders determining the rights of the parties with respect to those farming operations. The most important of which, I believe, at least for purposes of my argument, justices, is an order which was entered in December of 2007. That particular order allowed Paul and her attorney to control the assets of the corporation, if you will, the money's coming in, but allowed Artie to go ahead and farm the property in 2008. That farming operation did not take place, by the testimony it didn't take place, and even by the court's judgment, didn't take place, because Paul didn't allow the payment of certain expenses necessary for chemicals, fertilizers, and repairs to allow that farming to take place. The trial court, in its original form of judgment of disillusioned marriage in October of 2008, entered its final judgment in June of 2009, and this appeal has taken place from there. We argued basically on a brief, justices, five different points that we felt were important. It's really important at this point in time to discuss the issue of the farm property. As I indicated earlier, the farm property had been passed down from generation to generation. The court noted on page two of its judgment, and again on page three of its judgment, that the farm property, all the equipment, all the machinery, in essence, was contributed to the marriage by Artie. And I think that's an important point. He says that once on page two, then he says it on page three. Shortly after he says it on page three in his judgment, he says that that property was transmuted into marital property because of the party's work on the farm for a period of 27 years. I believe, Your Honors, the court's first obligation is to determine whether the property is truly marital or non-marital. What did the corporation own? The corporation owned the farm assets. Those were actually transferring these assets into the farm, or into the corporation. In fact, not only was the ground transferred into the farm corporation, but the machinery was actually placed in the corporation, two-thirds of which, according to the testimony, at least two-thirds of which, according to the testimony, was still owned by Artie's father at the time. And I think that's an important fact to know, and I'm glad Justice asked the question, because it's important to know that the whole reason behind the corporation was simply for tax purposes. It wasn't designed for any specific purpose of creating an entity or a transfer of any type of property from Artie or Artie's parents to Paula, but rather to give Artie and Paula tax breaks that come with incorporating that particular farm. Well, that's a legitimate reason to incorporate. Absolutely, it's a legitimate reason to incorporate. And the petitioner didn't question that trial, thought that was a great reason to incorporate, but it becomes an important issue, Your Honor, when you're talking about the issue of why property or why property is determined to be marital or non-marital. It doesn't automatically transfer because it's put into a corporation for tax purposes. And that was part of the argument that we made, part of the argument that the attorney made at the trial level also. We cited for this court the Watt Street case. The Watt Street case addressed both how you determine property, and secondly, how you deal with gifts from parents. And basically, the gifts from parents are treated as gifts to that individual. Is there any presumption that the trial court should make when property is transferred to a corporation? Yes, it does. It should. Well, I think when the property is transferred into both names, I think it makes the presumption that it's marital property. Now, this court, I don't think, didn't. I think this court said it was transmuted. And I believe they didn't use the term transmuted. It didn't say it was transferred into a marital asset. He said it was transmuted because of the time period that they acted, farming this particular farm over a period of 27 years. Is the corporation marital property? The corporation entity itself, I believe, would be marital property, Your Honor, but the assets would be corporation. But you're saying what the corporation owns is not marital property? Would not necessarily be marital property. That's what the Watt Street court says, Your Honor. The first thing you have to do is you have to look at whether the property is marital or non-marital. And the way you look at that is you look at the donative intent of the donative intent. That concept is kind of hard to get my arms around. I understand that, Your Honor. I think it was difficult in some respects, but the court also. But the court went on to say originally. You've got a marital property corporation, but the assets of the corporation are not marital. At the time the court determines property, the court has an obligation first to determine if it's marital or non-marital. Under Watt Street, then it must determine if it determines it's marital. Whether it determines it's transmuted or it was a gift, it then has to determine the contribution it's made. And that's the second point that we tried to make in our argument. Even if the court determines, even if this court determines that the court, for whatever reason, was right in its allocation of the property as being marital, then the court has to determine under 503A1 whether, I'm sorry, not 503A1, but under 503D1, whether or not the property, what contribution was made. In order to determine what contribution gets paid back to the person that made that contribution. In this particular case, the trial court judge disregarded section D1. Didn't even address it. Other than to say that it was all contributed to by Arnold. At the point in time it transfers the property, then it's got to go back and say, under D1, I now must address how to handle that contribution. But instead, the court basically says, because Arnie's contribution of labor during the term of the marriage was about half of what Paula's was, I'm disregarding it. It doesn't even mention D1. Not only does it not mention D1, it doesn't mention 503C2, which calls for a reimbursement to a non-marital estate for marital property that was enhanced by the non-marital estate. I believe, Your Honor, with regard to the marital assets, the court must take one of two positions. If it takes the position that it's marital, then it's got to deal with the contribution aspect. It takes the position that it's non-marital, it's got to give my client his non-marital property, neither of which happened in this case. Both of which, I believe, require reversal and at least remand back to the court with this court's instruction. The other issue or the next issue that we talked about, and before I leave that issue, I believe we cited the Gunther case. And the Gunther case is a real nice definition or a real nice evaluation of both sections D1 and C2 as to how those contributions need to go back. The next issue that must be addressed by the court, by this court, I believe, is the determination of values. The determination of values was particularly fuzzy for me as I looked at this, because the court viewed the Gall property to be worth $376,000, the Jacobs property to be worth $278,000, and the Myers Farm property to be worth $665,000. And at first glance, that looks like you shove two pieces of property this way, one piece of property this way, and you're good to go. But that's not the way the evidence showed up. And we cited for the court, for this court in our brief, the Odd case, which simply says that you have to have competent evidence of values before you create a division of property. In this case, I believe the only evidence of values of the land came from the appraisal of Bernhard and Kane. Bernhard and Kane said they appraised only the land, no houses, no parlors, no silos, no sheds were evaluated for purposes of their evaluation. And they determined that the farm ground, all of which is fairly close to one another, was worth about $4,750 per acre. The court determined that the Gall property then had a value of $4,700 an acre, which allowed it to rise at $376,000. No buildings were on the Gall property at all. It then viewed the Myers property at $4,750, even though the Myers property had two houses, two sheds, a milking parlor, and a barn, and several silos. Didn't count those at all. And there's several pictures included in the evidence that show all those different pieces of property. But the court viewed that property to be at $4,750, which is exactly the acreage value that Bernhard and Kane gave for land owned. So clearly that's inappropriate. Finally, and I think more unusual, is that it valued the Jacobs property, which it gave to my client, at $7,315 an acre. The Jacobs property, according to the pictures, only has an old house and an old shed. And the court valued that property at $7,315. Almost twice what it valued the Myers property at. And there's no evidence for that valuation. For those reasons, we believe this court must reverse the lower court's valuation and transfer the properties. The next issue that we talked about in our brief was the issue of dissipation, Your Honors. And the court found that my client dissipated $32,000, valued at $8,000 for four months, for a contract that was terminated with a guy by the name of Mike Gray. Testimony evidence showed that Mr. Myers and Mr. Gray had problems from the very onset. When Mr. Gray arbitrarily reduced the amount he was going to pay. In addition to that, Mr. Gray, according to Mr. Myers, didn't use his equipment appropriately. Didn't use the Myers' equipment appropriately. And Mr. Gray even testified he didn't know if he was going to continue on with that contract at all. Court held that under those circumstances, that's a dissipation. There's no evidence of any dissipation. And that issue of dissipation should be reversed. There is an issue, though, of dissipation with regard to Paulo. Paulo was authorized to handle all the funds, handle all the accounts. And Mr. Myers was allowed to run the property. The testimony evidence showed he wasn't allowed to run the property. He made several attempts. The court's very quick to point out several attempts to create that situation so he could go ahead and farm the property. But she wouldn't pay the bills necessary to do it. And ultimately, it didn't get farmed by Mr. Myers. It got rented out at a substantial loss to the parties. A substantial loss, at least to Mr. Myers, according to the testimony evidence, of at least $200,000. That dissipation has to fall only at the feet of Paulo. The court would clearly point out that she intentionally didn't deal with the debts and the expenses that were necessary to get the farming done. She cost herself money by costing my client money. That's the evidence of just the definition of dissipation. She used this money for a purpose totally unrelated to advancing the profitability of the farm accounts. And for that, she should have to reimburse my client for the monies that were lost that are clearly evidenced in the testimony. The judge addresses that simply by saying the farm property ended up getting rented out, so therefore, no harm, no foul. Even though the farm property got rented out at a tremendously less value, then the testimony showed that Myers were able to farm that property for it and make profits. And they were able to farm it on their own. The dissipation is clear in this particular case. And I believe that dissipation falls at the feet of Ms. Myers, Paulo Myers in that case. Finally, Your Honors, we address the issue of the maintenance. This court ordered an award of maintenance in the sum of $800 for a period of five years. After it had already ordered temporary maintenance in the sum of $3,000, where my client got substantially less than $300 a month, was giving her virtually most of the money that the farm was producing, all during the pendency of these proceedings. First of all, according to my figures, what the court gave Ms. Myers in this particular order was over a million dollars worth of income-producing assets. If he did that and that stuck, then under those circumstances, she doesn't have any need for them. That's the Bradsher case that we cited. Not every case results in an increase in necessary maintenance to be awarded, so we believe that should be reversed as well. Thank you, Your Honor. Thank you, Counselor. I have an opportunity for rebuttal. Mr. Welford. Please support, Counsel. I believe I need to start by expressing some more facts that Counsel has not fully described to you about this marriage and about this farm. As he stated, they were married in 1980. Paula was 19 years old. There was a 27-year marriage. There were no children. They both worked on the farm during that 27 years. There's extensive testimony from the parties, people who worked there, and suppliers that they both worked in every facet of the farm, from tilling to milking cows to doing these other things. More importantly, the documentary evidence at trial indicated that there were some deeds transferring this real estate from both the trust of Mr. Myers' parents and personally from Mr. Myers' parents to Paula and Artie Myers. Counsel stated that Mr. Myers had acquired 20 acres of property prior to the marriage where they built the house. There's no deed transferring any 20 acres of property. In fact, the evidence at the trial, Mr. Myers stated he thought he had a deed, but he didn't know where it was at. There's no reported deed. The deeds that we have that were introduced at trial include a deed dated January 22, 1987. That would be seven years after the marriage, and that came from the trust of Ruth Myers, who was Artie Myers' mother, and that was transferred to Artie Myers and Paula Myers as joint tenants. So seven years after the marriage, there was a transfer that was made to joint tenancy to a married couple. And that was for 20 acres, or what? That was for the original...actually, that wasn't for the 20 acres. These two transfers that I'll get to the next one was for the original 140-acre farm that we had referred to as the Myers' farm. But included in that transfer, and in the deed and the documentary evidence, there was $20,000 of consideration given to the trust of Ruth Myers. So there was consideration given for that transfer of what I would call a whole 140 acres. The second transfer happened the same day, came from the trust of William Myers, who was Artie Myers' father. That was also transferred to Artie Myers and Paula Myers as joint tenants. There was consideration on that one given for $15,000. So for the entirety of the 140 acres, there was consideration of $35,000 given. And this all happened, as I said, in 1987, seven years into the marriage. As counsel stated, the corporation that we talked about, Ready New Farms, Inc., was started by Paula Myers and Artie Myers in 1991, late 91 going into 92. As Justice asked, Paula Myers and Artie Myers were both shareholders, equal shareholders. They were both officers, and they were the only officers and only shareholders. The evidence provided in the trial stated they used this corporation essentially as their personal bank account. They paid for groceries through corporate activities, they paid for clothing, they paid for machinery, they paid for all these things through that corporation. And indeed, in October 8th of 1992, Artie Myers and Paula Myers transferred property that they held as joint tenants into that corporation. That would be approximately 80 acres of their total property that they transferred into the corporate name. That was done for tax purposes because the corporation had to own that land for them to be able to run a farming corporation, essentially. And in March 2001, Artie Myers and Paula Myers bought what we've heard about as a Jacob's land. They bought this on their own. This was another 38 acres, approximately. They purchased that, and it was in joint tenancy. So the only evidence in trial of transfers of real estate are indeed showing those properties transferring to Artie Myers and Paula Myers as joint tenants, and a transfer into the corporation. So I think that is very, very clear in the trial, that those things happened, and that's the way they did happen. Now the trial court did place great weight in the fact that they said these things had been transmuted, and they said it had been done so by the joint efforts of the parties, the commingling of these assets, and I'll get to that in a moment about machinery. But 50C3 provides the prospect of properties commingled and transmuted into marital property. The other party can't get contribution if it's clearly traceable by clear and convincing evidence. Well, we went through the real estate, and obviously there's no traceability of any acreage being gifted directly to Artie Myers and not Paula Myers. There was also an issue of machinery. They had farm machinery they acquired over this period worth approximately $400,000. Back when they incorporated, back in 1991, the parties provided that they were selling from themselves to the corporation over $230,000 worth of machinery. This happened in 1991 during the marriage. Mr. Myers is now claiming some of this machinery is non-marital in nature, and he should get contribution for that. There's no traceability as to what items he's claiming are non-marital. Are there titles to the machinery or anything? Nothing that's ever brought in. Okay. And then also the other thing that wasn't brought in was valuations. There was no valuations on certain pieces of machinery that were claimed to be that. The only appraisal that was done in this case was done by Paula Myers. There was a land appraisal that we heard about from Brian Kane, and that put a valuation on the land. There was also an appraisal done on the equipment done by Kyle Langham, who was a farm auctioneer and appraisal, and he came up with a valuation of $380,000 to $420,000. So asking for contribution in this case, number one, there's no clear traceability of evidence as to what was contributed. Number two, 503C states if the contributor was not making a gift to the marital estate, they wouldn't get contribution. So if they were making a gift to the marital estate, contribution wouldn't be had. I believe in this case it's clear anything that was transferred in was transferred to joint tenancy during the marriage. The machinery was transferred into a joint corporation, equally held, and I believe that's clearly a gift. If not, it's not traceable. Council brought an evaluation of these properties, and we talked about that appraisal done on the land. There was pictures brought in of these houses, the structures on the properties. There was never a valuation given to House A, B, or a shed or a silo. Valuations were not provided. The only appraisal, by a certified appraisal, was from Brian Kane's estate. It was 4,750 acres. There was testimony. Artie Myers stated what he thought the other property was worth, and that's what the court used to make its determination on valuation. It appears the court used both Mr. Myers' testimony as well as the certified appraisal. As far as the dissipation goes, I think it's very clear from the court's decision regarding the farming operations, and if I may back up, I got a little bit ahead of myself. This case became very acrimonious in the beginning, and the trial court essentially took away the bank account of the parties and placed it in Paula Myers' attorney's trust account. The parties either had to agree on how those funds would be spent, or they would come back in front of the court to address those issues. The case record is full of numerous transactions that did take place, numerous bills that were paid, but counsel is correct. At one point, the parties could not agree on how to proceed with the farming operation. I believe the court says a fair way in the evidence shows both parties engaged in actions of distrust and suspicion for the other party, and they were equally at fault in not getting that farming income. The court went on further to look at dissipation issues and how we looked at the conduct of Artie Myers. The first dissipation issue the court looked at there was the issue of Mike Gregg. Mike Gregg was the dairy operator who provided income of almost $8,000 to the parties, $8,000 to the parties. The testimony at trial elicited that after the divorce, Artie Myers was sabotaging the equipment, taking keys and these things, and Mr. Gregg left the farming operation due to the uncertainty and uneasiness that that was providing. The second issue, and the court talks about this in its holding, of Artie Myers hiding assets. There was testimony received, evidence introduced that Mr. Myers was supposed to be providing all funds for the farming operation to that trust account held by the attorney. Indeed, at trial, evidence was obtained that he had tried to transfer some $8,000 in bean shipments to his then-girlfriend, who refused to accept such money, and then transferred it to his mother. Further, the court cites they had very much suspicions about different grain differentials. There was testimony at trial that Mr. Myers stated he only got 22 to 23 bushels of beans in a year. Two other farmers who live in close proximity testified they received anywhere from 33 to 38 bushels. So the court declared the suspicious of that. And further, the court looked at some numerous cash transactions of Artie Myers. He cashed in a CD over $25,000 and could not account for those funds. So that's where the court came through those dissipation issues and found that Mr. Myers had dissipated. And I believe the court can look at the credibility in a dissipation issue and decide other dissipation issues based off the credibility of that witness. Obviously, the court didn't find Mr. Myers to be credible in those specific instances as to the dissipation issue. As to the maintenance issue. Let me ask you about that because the court's statement is a little disturbing to me. It looked like it almost was punishment for Mr. Myers' ongoing behavior, noncompliance with previous court orders, attempts to hide and conceal assets, which would not be proper standards for a ward of maintenance. Your Honor, I believe, and I don't have that verbiage in front of me, but I believe when we asked for maintenance at the trial, we were asking for a lump sum of maintenance. And I'm not sure if that's what the court was addressing. But we asked for a lump sum because we advised the court we didn't think periodic payments would work because of the hiding of assets. And that's what happened, and it was reduced to like $8,900. It's pretty minimal in the context of this whole. But those factors are not proper for determination of maintenance, are they? I would not think those are the factors the court would base it off of. No, but I would think in asking for a lump sum, those could be factors the court could. He used other language, the standard of living, which would be an appropriate basis. But then he said the need for finality of any relationship due to increasing acrimony and distrust. Again, I just don't see how that's a proper factor for maintenance. Here again, my reading of that would not be to the word of maintenance itself. It would be to a lump sum nature of it is how I interpreted that. And I believe that's what the court was searching for in creating some finality there. But I didn't believe that maintenance was proper in this case. They had outside jobs. Both parties did. And there was a great income differential in those jobs. My client was a part-time bus driver. Mr. Myers was driving a semi-truck hauling grain, rock, and other things. There were significant assets, but most assets were not liquid. My client had been receiving temporary maintenance, much more than this, during the pendency of this trial and did receive land and some other things in consideration of the marital settlement. But those items were tied up in real estate, other items that weren't liquid, and I believe that maintenance was a proper award in this case. Thank you. Thank you, counsel. Rebuttal? Raison? Your Honor, you made an excellent point, and I think it's important to say at this point in time that I believe the court's order is an attempt to punish Mr. Myers throughout. I don't think it's just the maintenance issue that he doesn't. If you look at the insurance question where the court heard testimony about the issue of an insurance policy, it was an annuity in the name of Artie's father. It was Artie's father's insurance policy. He transferred it to Artie. Artie, there was never any gift, never anything, and Ms. Myers said, well, I think Revenue and Farms paid some of the premiums on it. I asked for documentation about that. She didn't have any. The court said, you know, I think I remember hearing something at some point in time about the company paying some type of premium. So I'm going to order it to be split. There's nothing in the transcripts that indicate that at all, and the court certainly didn't go back to it to find that. But with regard to the issue of dissipation, I think it's crystal clear. The court said in its order, it said, the actions of Paul Myers for counsel in not immediately approving purchases meant that the farm operation did not proceed as it could have or have been profitable. That's dissipation. The court went on to identify five different areas where Paul Myers was notified of those things and didn't come through, didn't pay him off. That's clear dissipation. Then he goes on to identify when you disrupted a valuable asset. That's the idea of dissipation. That's the evidence of dissipation. She did it, but we're not going to punish her anyway, and he's got a statement at the very beginning of it that just says they both acted in distrust. So we're going to say that's not dissipation. But then he comes back and finds dissipation likely. With regard to the personal property, Mr. Wolford mentioned that the personal property was identified by Mr. Lang. The judge includes the $22,000 freightliner given to my client in two different spots. So he takes $22,000 loss simply because the court values the property $400,000. It included the freightliner. Then he gives the freightliner to him and gives a $22,000 loss to Ms. Myers for the same freightliner. Again, this all gets back to the idea of at some point in time, it reads as though the court is just trying to punish Mr. Myers. And it's looking for any way it can to do it so it can't find dissipation. The maintenance issue is important because it didn't take into account any income production from the farm. When Mr. Wolford is talking about the part-time bus driver, it doesn't count what she can make from the farm. The farm makes money every year. Like clockwork, it was making it every year. Court didn't take that into account when it valued it. So therefore, that assessment was wrong. It was inappropriate. And I think under the Bradshaw case, it identifies that. For all of those reasons, Your Honor, I believe the valuation, the classification of the property needs to be reversed. The valuation of the property, which Mr. Wolford didn't get into, is clearly wrong. It's way off. One point in time, Mr. Myers said he thought the property, the ground itself, had a value of $7,000 an acre, all the ground. The court took the property which he was giving to Mr. Myers and valued it over $7,000 an acre. And the buildings and all the land that he was giving, the Myers farm that he was giving to Ms. Myers, he valued it $4,750 an acre. There's no rhyme or reason for it. It clearly, there's no way, and Mr. Wolford can't identify a way in which that evaluation of that property can be allocated. The court also identified, when Mr. Wolford says you couldn't identify the property to be contributed, the court identified not once but twice. It said all the farm ground, all the farm machinery, all the equipment, with the exceptions of the gall and the date of the property were purchased through me, were provided by Arnie, either personally or through gifts from his parents. So the court identified them with specificity. It was very easy to give that back to him. It was very easy to identify it for purposes of contribution. On the valuation of the property, both the land and the machinery, did you have a separate appraisal? There was no separate appraisal, Your Honor. There was only one appraisal provided, Your Honor, and it was only an appraisal on the ground itself. Who presented that? I believe it was offered by a respondent with agreement of trial counsel. I was not trial counsel, but it appears from the reading of the transcript that it was by agreement of the parties that that would be offered without testimony, because I believe there was no testimony with regard to that. So I think they kind of agreed that that would be the valuation of the ground at $4,750 an acre. And then the judge took it upon himself to increase the value of the property given to Mr. Myers at $7,800 plus an acre, without any basis for it at all. So for those reasons, Your Honor, we ask that the court reverse, that this court reverse the decision of the lower court and remain with instructions to appropriately classify the property, account for the contributions, account for the appropriate dissipation, and account for the maintenance. Thank you. Thank you both, counsel. We appreciate your arguments and the briefs. The court will take the matter under advisement. We will stand at recess until 1 o'clock. All rise.